**JEFFREY MILSTEIN, INC., d/b/a Paper House Productions, Plaintiff–Appellant,**

v.

**GREGER, LAWLOR, ROTH, INC., d/b/a Triangle Enterprises, Defendant–Appellee.**

No. 94–9298.

United States Court of Appeals, Second Circuit.

Argued Feb. 22, 1995.

Decided June 19, 1995.

Leon Friedman, New York City (Sharyn Grobman, New York City, on the brief), for plaintiff-appellant.

Jeffrey A. Berchenko, Bogatin, Berchenko & Corman, San Francisco, CA, for defendant-appellee.

Before NEWMAN, Chief Judge, VAN GRAAFEILAND and CABRANES, Circuit Judges.

JON O. NEWMAN, Chief Judge:

This appeal, arising in the context of greeting card designs, poses issues concerning the limits of trade dress protection under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988).

Plaintiff-appellant Jeffrey Milstein, Inc., d/b/a Paper House Productions ("Paper House"), appeals from the order of the District Court for the Southern District of New York (Kevin Thomas Duffy, Judge), entered December 19, 1994, denying Paper House's motion for a preliminary injunction enjoining defendant-appellee Greger, Lawlor, Roth, Inc., d/b/a Triangle Enterprises ("Triangle"), from copying the unregistered trade dress of Paper House's greeting cards. That dress in essence comprises photographs die cut to the shapes of the objects depicted on the cards. According trade dress protection to this format would effectively grant Paper House a monopoly in the idea of using die-cut photographs on greeting cards. For reasons set forth below, we affirm.

## Background

Appellant Paper House is a New York corporation engaged in the business of manufacturing and selling greeting cards and note

cards. It started its business in 1982. Its greeting cards are typically a sheet of paper, folded vertically, that has been cut to the outline of an animal, person, or object depicted in a color photograph on the front panel of the card. With this die-cutting technique, the photograph completely fills the front panel. The inside panels and the back panel of the card are usually blank. The cards are packaged in clear cellophane bags.

Appellee Triangle is a California company that has manufactured stationery products for the past eight years. Its products include die-cut gift bags, die-cut stand ups, and die-cut note pads. Some time between May and August 1994, Triangle began to produce and sell "tri-cut" photographic greeting cards. Unlike Paper House's greeting cards, which depict the photographic image only on the front face, Triangle's cards depict the die-cut image on the front of all three panels of each card. Like Paper House's cards, Triangle's cards have blank interiors and are packaged in clear cellophane wrapping.

Paper House instituted this action, alleging that Triangle had copied its greeting card format, in violation of section 43(a) of the Lanham Act and New York's common law of unfair competition. Of Triangle's complete line of tri-cut greeting cards, Paper House selected six that allegedly copied Paper House's trade dress, though, as the District Court noted in its opinion, Paper House is not seeking protection with respect to only the handful of cards depicting photographic images similar to those used by Triangle; rather, Paper House is alleging infringement of the general format of its entire line of die-cut greeting cards.

At the hearing on Paper House's motion for a preliminary injunction, Paper House's president, Jeffrey Milstein, acknowledged that other greeting card companies have either marketed die-cut cards or used photographic images, but he asserted that his company was the first to produce a line of greeting cards that applied the die-cutting process to photographs.

Relying on the two-part test of trade dress infringement applied in *Two Pesos, Inc. v. Taco Cabana, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615 (1992), and *Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 582 (2d Cir. 1993), the District Court concluded that Paper House had shown neither distinctiveness of its trade dress nor likelihood of consumer confusion.

As the District Court noted, Paper House described its trade dress as "straight-on color photographs of animals, plants, people or objects, die-cut to the shape of the image of the photograph, with the inside of the card being a blank white color." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, No. 94 Civ. 8003 (KTD), mem. dec. at 4, 1994 WL 698214 (S.D.N.Y. Dec. 12, 1994) ("*Dist.Ct.Op.*"). Evaluating these characteristics for distinctiveness, the District Court determined that Paper House's trade dress was "generic," *id.* at 5, 1994 WL 698214, at *2, consisting solely of common and functional elements such as die-cutting, photographs, and blank white interiors. The District Court also found that Paper House had not demonstrated that its dress had acquired a secondary meaning.

With respect to the likelihood of confusion, the District Court applied the eight-factor test set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), and concluded that the only factors favoring Paper House were "proximity/bridging the gap" and the relative lack of sophistication among consumers of greeting cards. *Dist. Ct. Op.* at 7.

As to the other factors, the District Court found that Paper House's trade dress was weak at best, and any similarity between the two brands of greeting cards could be explained by "[t]he fact that Plaintiff's and Defendant's products depict similar natural objects, die-cut to form." *Id.* at 7–8. The District Court found no support for Paper House's allegations of deliberate copying,[1] and it found no evidence of actual confusion.

---

1. Though Paper House argued that Triangle was aware of Paper House's line of cards, Triangle denied copying and provided evidence indicating that at least some of the images used on its cards were previously reproduced on other Triangle merchandise.

In addition, the District Court noted that a visual inspection of Paper House's and Triangle's greeting cards failed to disclose an appreciable disparity in quality. Because Paper House had not satisfied the standard for trade dress infringement, the District Court found, Paper House could not show a likelihood of success on the merits of its Lanham Act claim. Moreover, in light of plaintiff's failure to prove either actual or likely confusion as to source, the District Court ruled that Paper House also had not shown a likelihood of success on the merits of its unfair competition claim. Finally, the District Court concluded that Paper House had not established that it would suffer irreparable harm in the event that the preliminary injunction was not granted, or that the balance of hardships tipped in its favor. Accordingly, the District Court denied Paper House's motion.

Discussion

A. *Standard of Review*

■ A party seeking a preliminary injunction must demonstrate (1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in the movant's favor. *See King v. Innovation Books,* 976 F.2d 824, 828 (2d Cir.1992). In the trade dress context, a showing of likelihood of confusion as to source will establish a risk of irreparable harm. *See LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 79 (2d Cir.1985). We review a decision denying a preliminary injunction "for an abuse of discretion which, when found, usually consists of the application of an incorrect legal standard or the reliance on clearly erroneous findings of fact." *Chemical Bank v. Haseotes,* 13 F.3d 569, 573 (2d Cir.1994).

B. *Lanham Act Claim*

Section 43(a) of the Lanham Act, "[t]hough enacted as part of the Trademark Act, ... functions as a federal law of unfair competition for unregistered goods ... [and] extends protection to a product's 'trade dress.'" *Coach Leatherware Co. v. AnnTaylor, Inc.,*

933 F.2d 162, 168 (2d Cir.1991). It provides a cause of action against any person who "in connection with any goods ... or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship, or approval of his or her goods ... by another person." 15 U.S.C. § 1125(a) (1988).

■ At one time, "trade dress" referred only to the manner in which a product was "dressed up" to go to market with a label, package, display card, and similar packaging elements. However, "trade dress" has taken on a more expansive meaning and includes the design and appearance of the product as well as that of the container and all elements making up the total visual image by which the product is presented to customers. *See LeSportsac,* 754 F.2d at 75. Thus, trade dress is "essentially [a product's] total image and overall appearance," *Two Pesos,* —— U.S. at —— n. 1, 112 S.Ct. at 2755 n. 1, "as defined by its overall composition and design, including size, shape, color, texture, and graphics." *AnnTaylor,* 933 F.2d at 168. To prevail in an action for trade dress infringement under section 43(a) of the Lanham Act, a plaintiff must prove (1) that its dress is distinctive and (2) that a likelihood of confusion exists between its product and the defendant's product. *See Two Pesos,* —— U.S. at ——, ——, 112 S.Ct. 2753, 2758; *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1038–39 (2d Cir.1992). However, functional packaging and product designs are unprotected, and the functionality of a design may be raised as a defense to an action for trade dress infringement. *See LeSportsac,* 754 F.2d at 75–76.

■ (1) *Distinctiveness.* We evaluate the distinctiveness of trade dresses according to the test set forth by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). *See Paddington,* 996 F.2d at 583. Under this test, dresses are classified as either: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful. *See Abercrombie,* 537 F.2d at 9. Suggestive and arbitrary or fanciful

trade dresses are considered to be inherently distinctive, and therefore always satisfy the first prong of the test for trade dress protection. If a dress is descriptive, however, the plaintiff must establish that it has acquired secondary meaning in order to become distinctive.[2] *See Two Pesos,* —— U.S. at —— ——, 112 S.Ct. at 2757–58. Generic dresses—"those that 'refe[r] to the genus of which the particular product is a species'"—are never protectable. *Id.* —— U.S. at ——, 112 S.Ct. at 2757 (quoting *Park' N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985)).

■ Although each element of a trade dress individually might not be inherently distinctive, it is the combination of elements that should be the focus of the distinctiveness inquiry. Thus, if the overall dress is arbitrary, fanciful, or suggestive, it is distinctive despite its incorporation of generic elements. *Cf. LeSportsac,* 754 F.2d at 76 (despite functionality of individual elements, bag was nonfunctional "when viewed in its entirety").[3] Nonetheless, the fact that a trade dress is composed exclusively of commonly used or functional elements might suggest that that dress should be regarded as unprotectable or "generic," to avoid tying up a product or marketing idea. *Cf. Stormy Clime,* 809 F.2d at 978 (referring to risk of monopolization of market where trade dress consists of "arrangement of predominantly functional features").

■ In evaluating claims to distinctive trade dresses, two additional considerations should be borne in mind. First, although trade dress law may supplement copyright and patent law by protecting unpatentable product configurations and novel marketing techniques, *see, e.g., LeSportsac,* 754 F.2d at 76–77, 79 (luggage design), overextension of trade dress protection can undermine restrictions in copyright and patent law that are designed to avoid monopolization of products and ideas. Consequently, courts should proceed with caution in assessing claims to unregistered trade dress protection so as not to undermine the objectives of these other laws. *See Stormy Clime,* 809 F.2d at 977–78 (noting that although patent laws "bestow[ ] limited periods of protection" to designs, "trademark protection extends for an unlimited period").

■ Second, just as copyright law does not protect ideas but only their concrete expression, neither does trade dress law protect an idea, a concept, or a generalized type of appearance. *See, e.g., Hartford House Ltd. v. Hallmark Cards Inc.,* 846 F.2d 1268, 1274 (10th Cir.) ("Blue Mountain has not been granted exclusive rights in an artistic style or in some concept, idea, or theme of expression. Rather, it is Blue Mountain's specific artistic expression, in combination with other features to produce an overall Blue Mountain look, that is being protected."), *cert. denied,* 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988); *Fashion Victim, Ltd. v. Sunrise Turquoise, Inc.,* 785 F.Supp. 1302, 1308 (N.D.Ill.1992). Examples of ideas or concepts too general to warrant protection are the "theme" of skeletons engaging in sexual activities, which plaintiff used in its t-shirt design, *see Fashion Victim,* 785 F.Supp. at 1308, and the "generalized concept" of grotesque figures in toys, *see Those Characters from Cleveland, Inc. v. J.J. Gams, Inc.,* No. 86 Civ. 3180, 1992 WL 135580, at *5 (S.D.N.Y. Apr. 12, 1992). By

---

**2.** Paper House asserts that the District Court erroneously required Paper House to prove secondary meaning sufficient for a finding of distinctiveness. Prior to the Supreme Court's decision in *Two Pesos,* this Circuit required a plaintiff seeking section 43(a) protection of a trade dress to establish distinctiveness by proving secondary meaning. *See Stormy Clime Ltd. v. ProGroup, Inc.,* 809 F.2d 971, 974 (2d Cir.1987). The Supreme Court specifically rejected this approach. *See Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2760. However, as the record shows, the District Court reviewed the issue of secondary meaning only after ruling that Paper House's

greeting cards lacked inherent distinctiveness and were "generic."

**3.** Paper House asserts that the District Court improperly evaluated the individual features of Paper House's trade dress in isolation rather than in combination. However, in determining that Paper House's dress was not distinctive, the District Court stated that it was "examining each card in its entirety" and "[t]aking these individual generic components as a whole." *Dist.Ct.Op.* at 5. Therefore, Paper House's objection is without merit.

contrast, the concrete expression of an idea in a trade dress has received protection. *See Hartford House,* 846 F.2d at 1269, 1274 ("specific artistic expression" consisting of "non-occasion emotional messages concerning love, personal relationships, and other similar subjects, superimposed on watercolor or airbrush artwork that generally had a landscape motif or nature theme"); *Roulo v. Berrie,* 886 F.2d 931, 935 (7th Cir.1989) (dress consisted of "beige, single-face (no fold) cards containing sentimental verses and frequently using ellipses written in Roulo's handwriting with brown ink"; "[f]lanking the messages on the left and right borders [were] a series of four stripes, two silver-foil stripes, enveloping one brown and one colored stripe in the middle"), *cert. denied,* 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990).

Drawing the line between "ideas" or "concepts" on the one hand and "concrete expressions" on the other may sometimes present close questions. Often a helpful consideration will be the purpose of trade dress law: to protect an owner of a dress in informing the public of the source of its products, without permitting the owner to exclude competition from functionally similar products. The line-drawing task is analytically no different than applying Learned Hand's "abstractions" test in the copyright field, *see Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 121 (2d Cir.1930), *cert. denied,* 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931), to distinguish an unprotectable idea from a protectable expression of the idea. The level of generality at which a trade dress is described, as well as the fact that a similar trade dress is already being used by manufacturers of other kinds of products, may indicate that that dress is no more than a concept or idea to be applied to particular products.

■ In this case, Paper House alleges that its trade dress comprises "straight-on, strong photographic, glossy images of animals, persons or objects on die-cut cards that are cut without bleed of any kind." Appellant's Reply Brief at 6–7. Paper House also

appears to include in its dress the blank interior of the cards, as well as the cellophane wrapping in which they are packaged. Paper House asserts that its card design is unique because the other die-cut cards have an "antique" look, are not glossy, are not completely die-cut, or are made from drawings rather than from photographs.

Despite its initial novelty within the greeting card industry, however, Paper House's trade dress cannot qualify for trade dress protection because Paper House is effectively seeking protection for an idea or concept— die-cut photographic greeting cards. It is clear that the first manufacturer to create a die-cut photographic product could not have claimed trade dress protection for all die-cut photographic designs, since a trade dress described as consisting solely of die-cut photographs would simply " 'refe[r] to the genus of which the particular product is a species.' " *Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2757 (quoting *Park' N Fly,* 469 U.S. at 194, 105 S.Ct. at 661).

That Paper House seeks trade dress protection only in the greeting card industry, and not with respect to all die-cut photographic products, does not alter our conclusion. Just as the first company to depict a heart and an arrow on Valentine's cards or to produce cards depicting tabby cats could not seek protection for those designs because they are concepts, defined abstractly, so Paper House cannot obtain protection for its general idea of creating cards out of die-cut photographs.[4]

Moreover, although Paper House argues that when it decided to apply the die-cutting technique to photographic greeting cards, a unique image resulted, Paper House's trade dress is more properly viewed as a refinement on the die-cut greeting card design. *Cf. Paddington,* 996 F.2d at 583 ("where it is the custom of an industry to package products in a particular manner, a trade dress in that style would be generic and therefore not inherently distinctive").

---

4. As the District Court below correctly perceived, since the photographs Paper House uses vary from card to card, only the use of die cutting and the depiction of photographs remain constant. In addition, Paper House also consistently uses blank white interiors as well as cellophane wrapping, but, as the District Court suggested, such "functional" elements do not increase the distinctiveness of the trade dress, even considered as a whole.

In sum, we agree with the District Court that Paper House is seeking trade dress protection for a generalized idea—one that has been applied, and has many applications, to products outside the greeting card context, including, for example, Triangle's die-cut photographic bags.

 Since the features of Paper House's trade dress for which it seeks protection can be considered "generic," even a showing of secondary meaning could not make that dress "distinctive." *See Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2757. In any event, Judge Duffy's determination of the secondary meaning issue was proper. Secondary meaning suggests that, with time and market exposure, a trade dress may come to identify not only goods, but also the source of the goods. *See George Basch Co., Inc. v. Blue Coral, Inc.,* 968 F.2d 1532, 1536 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992). Paper House presented a number of articles in industry and trade publications discussing its greeting card product line, but provided no consumer survey or other evidence suggesting that its trade dress identified the source of the product. Based on this limited evidence, the District Court's finding as to lack of secondary meaning was not clearly erroneous.

(2) *Likelihood of Confusion.* As the District Court recognized, it could properly have denied injunctive relief on the basis of Paper House's failure to prove the distinctiveness, and thus protectability, of its trade dress. Nevertheless, the District Court went on to consider the issue of whether Paper House had met the second part of the *Two Pesos* test by demonstrating a likelihood of confusion. We briefly review the District Court's findings on this issue because of their relevance to our evaluation of the unfair competition claim.

 In evaluating likelihood of confusion, we are guided by the non-exclusive factors set forth by Judge Friendly in *Polaroid,* 287 F.2d at 495. *See Paddington,* 996 F.2d at 583 (applying *Polaroid* factors to trade dress claim). These factors are: (1) the strength of plaintiff's dress; (2) the similarity between the two dresses; (3) the proximity of the products in the marketplace; (4)

the likelihood that the prior owner will bridge the gap between the products; (5) evidence of actual confusion; (6) defendant's bad faith; (7) the quality of defendant's product; and (8) the sophistication of the relevant consumer group. We review the District Court's determination of each *Polaroid* factor under a clearly erroneous standard, but the ultimate evaluation of likelihood of confusion, which is based on a weighing of the factors, we review *de novo. Id.* at 584–85.

 We find no error in the District Court's factual determinations regarding the weakness of Paper House's dress, the similarity of Paper House's and Triangle's greeting card designs, the competitive proximity of the two brands of greeting cards, the issue of bridging the gap (which adds no weight here, since Paper House and Triangle are selling similar products in the same market, and there is no gap to bridge), the lack of evidence of actual confusion or bad faith copying on Triangle's part, the comparable quality of Paper House's and Triangle's cards, and the relative lack of sophistication of consumers. When these factors are weighed together, it is apparent—particularly in view of the weakness of Paper House's trade dress, the absence of bad faith on Triangle's part, and the absence of actual confusion—that the balance favors Triangle. Thus, Paper House has not shown a likelihood of confusion, the second part of the *Two Pesos* test.

### C. *Common Law Unfair Competition Claim*

 In addition to the statutory claim discussed above, Paper House also brought a common law cause of action for unfair competition. "[T]he essence of unfair competition under New York common law is 'the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.'" *Rosenfeld v. W.B. Saunders, A Division of Harcourt Brace Jovanovich, Inc.,* 728 F.Supp. 236, 249–50 (S.D.N.Y.1990) (quoting *Computer Assocs. Int'l, Inc. v. Computer Automation, Inc.,* 678 F.Supp. 424, 429 (S.D.N.Y.1987)), *aff'd,* 923 F.2d 845 (2d Cir.

1990). In a common law unfair competition claim under New York law, the plaintiff must show either actual confusion in an action for damages or a likelihood of confusion for equitable relief. *See W.W.W. Pharmaceutical Co. v. Gillette Co.*, 984 F.2d 567, 576 (2d Cir.1993) (citation omitted). Additionally, there must be some showing of bad faith. *See Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980). Because Paper House failed to prove actual or likely confusion, or Triangle's bad faith, the District Court correctly concluded that Paper House did not show a likelihood of success on the merits in connection with this claim.

### D. *Other Requirements for Preliminary Injunction*

Since Paper House provided no factual evidence of injury, provided no proof of copying by Triangle, and failed to establish actual confusion or a likelihood of confusion, a risk of irreparable harm has not been demonstrated.

Moreover, Paper House not only failed to show a likelihood of success on the merits; it did not even raise serious questions going to the merits, because Paper House's alleged trade dress lacks distinctiveness and Paper House did not present facts sufficient to establish a likelihood of confusion. Furthermore, the balance of hardships tips in Triangle's favor, because Paper House seeks to enjoin an entire product line, which, if ordered by the District Court, would cause Triangle considerable hardship far outweighing any speculative possibility that Paper House's goods would be harmed by consumer confusion.

### Conclusion

The District Court did not exceed its discretion in denying the motion for preliminary relief. Accordingly, the order is affirmed.