**MANA PRODUCTS, INC.,**
**Plaintiff–Appellant,**

v.

**COLUMBIA COSMETICS MFG.,**
**INC., Defendant–Appellee.**

No. 1102, Docket 94–7868.

United States Court of Appeals,
Second Circuit.

Argued March 16, 1995.

Decided Sept. 19, 1995.

1064

Edward C. Kramer, New York City (Darryl J. Kramer, Samuel Frankel, Kramer & Kramer, of counsel), for plaintiff–appellant.

Eugene P. Devany, Merrick, NY (Ronald S. Galasi, Curtis, Zaklukiewicz, Vasile, Devine & McElhenny, of counsel), for defendant–appellee.

Before: OAKES, CARDAMONE, and ALTIMARI, Circuit Judges.

CARDAMONE, Circuit Judge:

This is an appeal in a trademark case. Plaintiff Mana Products, Inc. (Mana) appeals from a judgment entered August 3, 1994 in the United States District Court for the Eastern District of New York (Amon, J.), that granted summary judgment to defendants Columbia Cosmetics Mfg. Inc., (Columbia) and dismissed plaintiff's complaint for trade dress infringement under the Lanham Act, 15 U.S.C. § 1051–1127 (1988), the New York state common law of unfair competition, and the New York Anti-dilution statute, N.Y.Gen.Bus.Law § 368–d (McKinney 1984). Mana alleged that Columbia sold and continues to sell a line of cosmetics that in every significant way is a copy of Mana's makeup products. The Lanham Act claims were dismissed on a finding that the trade dress of Mana's black compact makeup cases was not inherently distinctive, nor had it acquired secondary meaning within the private label

cosmetics market. Mana's state law claims were dismissed for similar reasons.

## BACKGROUND

### A. Facts

Mana and Columbia are in the business of manufacturing and selling at wholesale a line of "private label" cosmetic products to beauty salons and other retailers throughout the United States. Customers purchase "private label" products from Mana and Columbia, affix their own brand name labels to the products, and then resell them to their retail consumers.

In its complaint Mana alleged it developed lines of cosmetic products with certain designs, word designations, and color combinations, and created catalog numbers, price lists, and advertisements that identify its products to the private label cosmetics market. Exhibits of its sales materials and advertisements were appended to the complaint. The complaint did not refer specifically to these exhibits, nor did it detail examples of copying or identify those products that Columbia allegedly infringed. From 1979 through 1982, Mana further stated, Columbia was an authorized distributor of Mana's products in the private label cosmetics industry, but in 1982 began marketing a competing line of cosmetic products infringing on the trade dress of Mana's makeup products.

### B. Prior Legal Proceedings

As a result of this competition from a former distributor, plaintiff, also known as Your Name Cosmetics Inc. (Your Name), filed a complaint on August 28, 1990 seeking injunctive relief and monetary damages against defendant. When Columbia moved for summary judgment plaintiff submitted in response the affidavit of Sharon Garment, Mana's vice-president of marketing, and appended four photographs of Mana's and Columbia's black compacts and copies of two advertisements. Mana also submitted the affidavit of Jane Rosen, the owner of a cosmetics business, to prove inherent distinctiveness and actual confusion in the cosmetics

market. Ms. Rosen was surprised to find that Mana and Columbia were two totally separate and unrelated companies.

Noting that Mana's complaint contained broad allegations that Columbia had copied the geometric shape and color of Mana's compacts and the exotic names used to describe the various shades of color included in those cosmetic kits, the district court concentrated primarily on Mana's claims with respect to the black compacts, the photographs of which had been submitted by Ms. Garment. The four photographs were the only evidence submitted by plaintiff as proof of the alleged infringement.

Additionally, during the hearing on the motion for summary judgment, Columbia's counsel stated that defendant had changed all of its products' color names and catalog numbers. Judge Amon inquired whether the copying of the shape of the compacts and its color arrangements were at the heart of Mana's claims. Counsel for plaintiff answered, "It's the cases along with the color of the cases—the black cases—the shape of the case and the size—the inside mold which is the same as ours ... and the color combinations of cosmetics." From this answer the district judge determined that Mana had abandoned its claims regarding the other allegedly infringing products and had thereby narrowed its claims to include only the similar size, shape, and color of certain powder, blush, and eye shadow compacts that comprise a portion of both parties' product lines.

Based on the Supreme Court's test for trade dress infringement, Judge Amon ruled that Mana had not shown its black makeup compacts were distinctive. Hence, she found it unnecessary to decide whether a likelihood of confusion existed between plaintiff's and Columbia's compacts. The trial court found nothing about the compacts' total image—comprising its basic rectangular design, arrangement of mirrors, makeup tins inside the compacts and the color combinations of the tints and black color cases—was inherently distinctive. Instead, it concluded the black compact cases were generic because Mana did not design them, but instead purchased the plastic cases used as its compacts from

independent manufacturers in the open market. Mana conceded that similar plastic cases can be purchased from a number of independent manufacturers.

As a result of the district court judge's inquiries, plaintiff focused more precisely on appeal what it considers an infringement of its products. First, it thinks Columbia's Ultimate Skin Achievement Program (USA) products have the identical logo and container that Mana uses on its European Skin Protection (ESP) products. But Mana's photo depiction of its ESP products did not offer any visual evidence revealing the alleged similarity with the USA logo or container. Columbia's label and logo are on the back of the products and are not seen in the photographs.

Second, Mana maintains that Columbia "unfairly imitated" its vinyl kits. Yet, Nikos Mouyiaris, Mana's president, admitted in a deposition that the packaging for Columbia's travel kits—similar to Mana's vinyl kits—are generic in the industry.

Third, plaintiff asserts defendant infringed on its trade dress by packaging cosmetics in similar jars, caps, and other containers, but at the same time generally concedes that it was itself using generically available packaging materials.

Fourth, plaintiff states Columbia infringed on its catalog numbers and names for color combinations. Mana refers to defendant's use of 12 colors of eye shadow tint sets, 12 colors of powder blush-on, and seven colors of duo blush-on. Columbia's counsel acknowledged that before 1990 Columbia used two percent of the one thousand catalog numbers and about 18 out of 200 or 300 color combinations. Additionally, a deposition of Rachel Randel, Columbia's president, revealed that before defendant manufactured its own products and was purchasing Mana's products, it included Your Name's product name, colors, and numerical code within its price list. After Columbia ceased buying Your Name products it continued this practice. However, after initiation of the instant litigation, all color names and catalog numbers were changed. Mana did not contest Columbia's assertion that it had stopped using Mana's color names and catalog numbers

and that any conceivable infringement other than the alleged copying of the makeup compacts was "inconsequential."

Finally, Mana believes Columbia was infringing a series of black makeup compacts each containing either powder, blush, or eyeshadow. Plaintiff referred to the four color photographs of Mana's and Columbia's compacts that showed the arrangement of the rectangular inserts and the color schemes to prove the infringement of its black compact cases. In the photographs, all of the compacts are black with no decorative features except for two of Mana's compacts with white tops. The compacts are all rectangular or square shaped with mirrors and makeup tins inside. Although the compacts are the same size, the makeup colors and textures of the tints look somewhat different.

Before this appeal, Columbia nevertheless admitted its compacts' shape, size and colors are essentially the same in appearance and trade dress as Mana's compacts. "He used them, I used them, 50 other companies use them. Anyone that the plastic manufacturer sells to uses them." In a deposition, Ms. Randel stated that she made decisions on packaging based upon what she could "get in the industry." She further declared that to her knowledge, compacts are manufactured in a "square, rectangle [shape], that's it."

With respect to the other proof plaintiff offered, the district court ruled that Ms. Rosen's affidavit and Mana's assertion of spending $3 million for advertising were insufficient to prove that Mana's trade dress had acquired a secondary meaning in the market. Judge Amon therefore granted defendant's motion for summary judgment and dismissed plaintiff's complaint. From this judgment Mana appeals. We affirm.

## DISCUSSION

### I Lanham Act

During oral argument before us Mana's counsel centered his arguments around the alleged infringement of Mana's makeup compacts with respect to shape, color of makeups, and the black color of the compact as the basis for plaintiff's claims. When counsel

was asked for visual evidence showing that Columbia copied Mana's trade dress for other products and its display, counsel offered only Ms. Rosen's affidavit stating that at a single trade show she thought Columbia's products were Mana's. In view of the lack of proof with respect to the trade dress of Mana's other products, discussion will focus only on whether Columbia infringed Mana's trade dress for its black compacts.

The Lanham Act expanded the private common law right of action for commercial injuries resulting from deceptive advertising and marketing. 15 U.S.C. § 1051–1127 (1988). Section 43(a) of the Act, 15 U.S.C. § 1125(a), provides that:

[a]ny person who shall affix ... in connection with any goods ... or containers for goods, ... any false description or representation, including words or other symbols ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

Lanham Act, 15 U.S.C. § 1125(a) (1988) (current version at 15 U.S.C. § 1125(a)(1) (1994)).

Congress enacted this trademark legislation to protect consumers and trademark owners. It was the legislature's aim to ensure that when consumers purchase a product they like, one that bears a familiar trademark, they may be confident the product they ask for is the one they will get. That is, a consumer may minimize his search. The Act also protects trademark owners. As trademark owners have expended time and money in presenting their products to the public, they are entitled to have their investment protected from misappropriation by pirates and cheats. *See* S.Rep. No. 1333, 79th Cong., 2d Sess. 3–5 (1946). Congress believed that protecting trademarks fosters fair competition, assures that consistent quality of trademarked goods may be maintained over time, and secures to trademark owners their reputation and goodwill. *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 198, 105 S.Ct. 658, 663, 83 L.Ed.2d 582 (1985).

■ Section 43(a) of the Lanham Act extends protection to trade dress, *see Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S.

763, ——, 112 S.Ct. 2753, 2760, 120 L.Ed.2d 615 (1992) ("§ 43(a) provides no basis for distinguishing between trademark and trade dress."), and it furnishes a civil action for trade dress infringement. *See Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 168 (2d Cir.1991); *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695, 702 (5th Cir.1981), *cert. denied,* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982). The term trade dress refers to how a product looks, its total image, or its overall appearance. As such, it includes a product's "composition and design, including size, shape, color, texture and graphics." *Coach Leatherware Co.,* 933 F.2d at 168; *Stormy Clime Ltd. v. ProGroup, Inc.,* 809 F.2d 971, 974 (2d Cir.1987).

■ To prevail in a trade dress infringement suit under the Lanham Act, plaintiff must first prove that its identifying mark is itself inherently distinctive *or* that it has become distinctive by acquiring a secondary meaning. Second, plaintiff must show that a likelihood of confusion exists between its product and the defendant's. *See Two Pesos,* 505 U.S. at ——, 112 S.Ct. at 2758. Finally, eligibility for protection of an identifying mark also depends on its nonfunctionality. Functionality is defined as the quality essential to the product's purpose. *Id.* at ——, 112 S.Ct. at 2760 ("a design is legally functional, and thus unprotectable, if it is one of a limited number of equally efficient options available to competitors and free competition would be unduly hindered by according the design trademark protection."); *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982) ("feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.").

■ Defendant bears the burden of proving functionality as a defense to plaintiff's claim of infringement. *See LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 76 (2d Cir. 1985). The Lanham Act does not protect functional packaging and commonplace product design because competition would be "stifled by the exhaustion of a limited number of

trade dresses." *Two Pesos,* 505 U.S. at ———, 112 S.Ct. at 2760–61. Since the district court did not find Mana's trade dress distinctive, it did not reach or decide the issues of likelihood of confusion or functionality. Thus, discussion turns next to the issue of distinctiveness.

## II Distinctiveness

Distinctiveness, the first element that must be proved in a trade dress infringement cause of action, split the Circuits until the Supreme Court resolved the matter in *Two Pesos,* 505 U.S. at ——— ———, 112 S.Ct. at 2759–60. We had required a plaintiff seeking trade dress protection to establish distinctiveness by showing that its product acquired a secondary meaning in the marketplace. *Id.* at ——— ———, 112 S.Ct. at 2759–60; *Stormy Clime,* 809 F.2d at 974. The Fifth Circuit held to the contrary that a demonstration of secondary meaning is not required in every trade dress infringement action. *See Chevron,* 659 F.2d at 702.

■ In 1992 the Supreme Court in *Two Pesos* rejected our approach and adopted the Fifth Circuit's view that trade dress should be categorized in the same manner as trademarks and, accordingly, secondary meaning is not required where a trade dress is a distinctive identifying mark. *See* 505 U.S. at ———, 112 S.Ct. at 2760. "The general rule regarding distinctiveness is clear: an identifying mark is distinctive and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning." *Id.* at ———, 112 S.Ct. at 2758 (citing *Restatement (Third) of Unfair Competition* § 13 (Tent. Draft No. 2 (1990))). If a trade dress is inherently distinctive, it is not necessary to establish that a product has acquired secondary meaning in the marketplace because the packaging itself "is capable of identifying products or services as coming from a specific source." *Id.* at ———, 112 S.Ct. at 2760.

■ In *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir. 1976), Judge Friendly classified trademarks for purposes of their protection in categories according to ascending degrees of inherent distinctiveness. These categories are: "(1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Id.* Trade dress later embraced these same classifications. *See Two Pesos,* 505 U.S. at ———, 112 S.Ct. at 2760. Generic marks refer "to the genus of which the particular product is a species" and are not entitled to trade dress protection. *Park 'N Fly,* 469 U.S. at 194, 105 S.Ct. at 661 (quoting *Abercrombie,* 537 F.2d at 9). Marks that simply describe a product are not inherently distinctive, and plaintiff must prove that its descriptive mark has acquired secondary meaning to satisfy the first prong of the Lanham Act trade dress analysis. *See* 469 U.S. at 196, 105 S.Ct. at 662. Suggestive and arbitrary or fanciful marks are inherently distinctive. Hence, these marks always satisfy the first element of the test for trade dress protection.

■ In addition, a product's distinctiveness is based upon the way in which the trade dress, when viewed as a whole, appears to the observer, not on a single aspect of its design; that is to say, trade dress today encompasses a broad concept of how a product presented to the public looks, including its color, design, container, and all the elements that make up its total appearance. *See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 32 (2d Cir.1995). Mana insists that while its compacts may include generic design elements, the overall combination of the design, that is, its total impression is inherently distinctive.

■ Granting a defendant's motion for summary judgment in an infringement action brought under the Act on the issue of whether plaintiff's product is or is not inherently distinctive is not generally favored. This is the general rule because a producer has endless options when packaging its products, so often trade dress will be arbitrary or fanciful and thus inherently distinctive. The often more significant question—whether there is a likelihood of confusion—is usually a question of fact. *See Chevron Chemical,* 659 F.2d at 703.

■ Yet here, where it is the custom in a particular industry to package products in a similar manner, a trade dress done in that

style is likely to be generic. In other words, when the possibilities of the ultimate trade dress for a product are limited and the trade dress is therefore in commonplace use, it is unlikely that consumers will view the trade dress as distinctive of the goods or services of a particular seller. *See* Restatement (Third) of Unfair Competition § 13 cmt. d (1995). In the compact industry, nothing about a rectangular or square shape or black color is "striking, unusual, or otherwise likely to differentiate the products of a particular producer. . . ." *Id.*

■ The district court properly concluded that plaintiff failed to establish that its black makeup compacts were inherently distinctive. A trade dress is inherently distinctive if its "intrinsic nature serves to identify a particular source of a product." *Two Pesos,* 505 U.S. at ——, 112 S.Ct. at 2757. Mana's arguments are unconvincing because the record shows that both plaintiff and defendant purchased the same plastic compact cases from independent manufacturers. Mana admits that "similar models of each of the components comprising the cosmetics packaging of plaintiff can be purchased by other companies" and are widely available. When it is readily allowed that other cosmetic distributors and retailers have used the identical packaging or containers, it defies simple logic to suggest that the packaging was inherently distinctive.

To avoid having its products categorized as generic, Mana maintains that the color of the inserts and the compact itself were distinctive. However, the total impression of plaintiff's compacts cannot be described as suggestive, arbitrary, or fanciful. As a whole, the compacts' size and shape—with their rectangular and square designs—are common characteristics of the entire genre of makeup compacts. The mirrors, tins, and the makeup inside the compacts are at best, descriptive, in the cosmetics industry. Consequently, Mana's makeup compacts are not inherently distinctive. Since they are at best descriptive, then they must have acquired secondary meaning in order to be distinctive and therefore protected.

### III   Secondary Meaning

■ Whether a trade dress has acquired secondary meaning is a factual matter subject on review to the clearly erroneous test. *See Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1043 (2d Cir. 1992). Plaintiff must prove a given trade dress has acquired secondary meaning. "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Laboratories,* 456 U.S. at 851 n. 11, 102 S.Ct. at 2187 n. 11; *Blisscraft of Hollywood v. United Plastics Co.,* 294 F.2d 694, 697 (2d Cir.1961) (to establish secondary meaning, plaintiff must show design is "mark of distinction identifying the source of the article and that purchasers are moved to buy it because of its source."); *see* Restatement (Third) of Unfair Competition § 13 cmt. e (1995).

■ One of Mana's principal arguments in this litigation is that its cosmetic compacts are entitled to trademark protection because of their color: black. While there is no fixed rule for the amount of proof necessary to prove secondary meaning, in the case of a color mark for a trade dress the burden is heavy because color marks by their very nature are not generally distinctive. *See In re Owens–Corning Fiberglas Corp.,* 774 F.2d 1116, 1127 (Fed.Cir.1985).

In fact, at one time it was accepted that trademark protection could not be granted for color alone. *See* Richard J. Berman, Note, *Color Me Bad: A New Solution to the Debate Over Color Trademark Registration,* 63 Geo.Wash.L.Rev. 111 (1994). Sweeping away that barrier the Federal Circuit in *In re Owens–Corning,* 774 F.2d at 1116, permitted Owens–Corning to register the color pink for its insulation material. And now the debate over whether color alone may be a valid trademark has been put to rest earlier this year in *Qualitex Co. v. Jacobson Products Co. Inc.,* —— U.S. ——, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995). *See also Fabrication Enterprises, Inc. v. The Hygenic Corporation,* 64 F.3d 53 (2d Cir.1995). In *Qualitex* the Supreme Court could not discern any

"obvious theoretical objection"—based on the purposes of trademark law—why color alone should not obtain protection where the color attains secondary meaning, thereby identifying a particular product as to its source. *Qualitex*, —— U.S. at ——, 115 S.Ct. at 1303.

In light of the Supreme Court's decision in *Qualitex*, color is today capable of obtaining trademark status in the same manner that a descriptive mark satisfies the statutory definition of a trademark, by acting as a symbol and attaining secondary meaning. In *Qualitex*, the Supreme Court held that the green-gold color of plaintiff's dry cleaning press pads qualified as a trademark under the broad terms of the Lanham Act. The Court reasoned that "over time, customers may come to treat a particular color on a product or its packaging ... as signifying a brand. And, if so, that color would have come to identify and distinguish the goods—i.e. 'to "indicate" their "source"—much in the way that descriptive words on a product ... can come to indicate a product's origin.'" *Id.* at ——, 115 S.Ct. at 1303. In this instance, the Court found that although the green-gold color may not be inherently distinctive, it has developed secondary meaning. *Id.*

In determining whether the consuming public for a particular product had associated that product, designated by its mark, with its source, certain elements must be assessed. These elements are: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Centaur Communications, Limited v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1222 (2d Cir.1987).

Unlike *Qualitex*, Mana has not proved the existence of secondary meaning in its trade dress. First, plaintiff claimed to have spent over $3 million in advertising its products. However, a plaintiff's advertising budget is only one of the factors probative of secondary meaning. *See McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1133 n. 4 (2d Cir.1979). Second, Mana submitted the affidavit of Jane Rosen as evidence of secondary meaning. This single affidavit of a single customer at a single tradeshow is insufficient to show that a specific trade dress for a particular product connects Mana as the source of the product. Plaintiff failed to submit any consumer surveys, information as to the relative market share of its cosmetics, unsolicited media coverage, or the amount of time that the compacts made exclusive use of the challenged design. Absent this sort of information Mana failed to raise a material issue of fact as to whether its compacts had acquired secondary meaning in the marketplace.

Further, although color may be a protected trademark, it is not always so protected. The color black does not act as a symbol and distinguish Mana's compacts from its competitors. It does not identify plaintiff as the source because there are countless numbers of cosmetic companies that sell black compacts. The district court properly recognized that the color black could not reasonably be given protection since it would be analogous to "according trade dress protection to a product's 'plain brown wrapper' merely because it did not have to be brown." We agree that black is as common a color for a makeup case as brown is for a paper bag. As Mana's trade dress is not inherently distinctive and it has failed to acquire a secondary meaning, it is not distinctive.

Therefore, we need not examine the second required element—a likelihood of confusion between plaintiff's and competitor's products—or analyze arguments as to reverse confusion between the two trade dresses. For the same reason there is no need to discuss the possible defense of functionality. Having ruled that dismissal of plaintiff's complaint should be affirmed, plaintiff's request that the state law claims be restored is moot.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.